No. 87-77

IN THE SUPREME COURT OF THE STATE OF MONTANA

1987

ARLYN McJUNKIN and LORRAINE
McJUNKIN,

        Plaintiffs and Appellants,

   -vs-

KAUFMAN and BROAD HOME SYSTEMS, INC.,
a California Corp., and PONDEROSA HOMES,
a Montana Corporation,

        Defendants and Respondents.

APPEAL FROM: District Court of the Eighteenth Judicial District,
In and for the County of Gallatin,
The Honorable Thomas Olson, Judge presiding.

COUNSEL OF RECORD:

    For Appellant:

        Larry W. Moran, Bozeman, Montana

    For Respondent:

        Herndon, Harper & Munro; Rodney T. Hartman, Billings,
Montana
Berg, Coil, Stokes & Tollefsen; Gig A. Tollefsen,
Bozeman, Montana

Submitted on Briefs: Nov. 13, 1987

Decided: December 22, 1987

Filed: DEC 22 1987

Clerk

Mr. Justice John C. Sheehy delivered the Opinion of the Court.

Following trial by jury in the Eighteenth Judicial District, Gallatin County, judgment was entered against Kaufman and Broad Homes (K & B) on a claim of negligence and against Ponderosa Homes (Ponderosa) on a claim of negligent misrepresentation. All litigants allege error. We affirm.

The parties present the following issues for review:

1. Did the District Court properly refuse to instruct the jury on strict liability, the covenant of good faith and fair dealing and punitive damages?

2. Did the District Court properly grant directed verdicts dismissing claims of breach of the implied warranty of habitability, breach of the implied warranty of merchantability, express warranty and constructive fraud?

3. Did the District Court properly allow the jury to view the mobile home at issue?

4. Did the District Court properly refuse to grant a directed verdict on the claims of negligence and negligent misrepresentation?

Ponderosa is engaged in the business of selling mobile homes, including those manufactured by K & B. The controversy at hand arose from the McJunkins' purchase of a K & B mobile home from Ponderosa.

In December, 1982, the McJunkins met with Ponderosa salesman Vern Gusick concerning the purchase of a K & B mobile home. The McJunkins subsequently returned to Ponderosa and ordered a K & B mobile home with a number of special features. It arrived in Belgrade on or about December 21, 1982.

The McJunkins first inspected their mobile home on December 23, 1982. At that time, Mr. McJunkin noted that the mobile home did not conform to their specifications in certain areas. The McJunkins allege that they told Gusick they were not going to take the mobile home. Gusick is alleged to have responded that the trailer was a special order and they had to take it. In any event, it is uncontested that Gusick informed the McJunkins not to worry, that everything will be taken care of. Thereafter, the McJunkins entered an installment contract for the purchase of the mobile home.

Ponderosa transported the trailer to the McJunkins' home in Sheridan, Wyoming, and set it in place. Mrs. McJunkin testified that she observed the mobile home fishtail wildly during the trip on an icy curve near Crow Agency. The stress placed on the trailer during this incident is alleged to be partially responsible for problems the McJunkins later had with the trailer.

Immediately upon moving in, the McJunkins noted problems with the mobile home. A significant problem was that the trailer was not level. The serviceman who attempted to relevel the trailer discovered that it could not be leveled because of the frame. Mr. McJunkin was advised by the serviceman not to move the trailer as a result. At various times, the McJunkins also discovered that the doors fit poorly; the carpet was coming loose; the floor plan had not been changed; there were not copper pipes as ordered; shutters were missing; the ceiling fan was defective; there was not an outside faucet as ordered; the furnace was noisy; the vent was in the wrong place; the shower heads were not positioned as ordered; the wrong materials had been used in the bathroom door casings; the paneling was coming off the bath wall; the door trim had been incorrectly installed; a

special order cabinet was damaged; shingles came off the roof; the floor tile was coming up around the toilet; the front door lock broke; the door bell was installed on the wrong side; and other problems.

Although Ponderosa and K & B made efforts to remedy some of the defects, the McJunkins received very little relief. Efforts to correct defects often resulted in further damage or more sloppy work. As a result, the McJunkins sent a revocation of acceptance on December 10, 1984, but continued to live in the trailer.

Prior to trial, both parties had engineers examine the mobile home for structural defects. The engineer who examined the trailer at the request of the McJunkins found that the wooden frame had been overstressed at some point. He agreed with the serviceman that the trailer should not be moved. Defendants' engineer examined the mobile home after it had been returned to Belgrade. In his opinion, the frame had not suffered excessive stress and could safely be moved. Both engineers agreed that the mobile home was habitable. The jury was also allowed to view the mobile home to make their own determination. Many of the alleged errors revolve around the sufficiency of the complaint filed on December 21, 1984, as amended by the pretrial order of October 6, 1986.

The liberal pleading philosophy of the Montana Rules of Civil Procedure has superseded the highly technical theory of code pleading which often resulted in substantial injustice to the injured party. "Ancestor worship in the form of ritualistic pleadings has no more disciples. The time when the slip of an [attorney's] quill pen could spell death for a plaintiff's cause of action is past." Thompson v. Allstate Insurance Company (5th Cir. 1973), 476 F.2d 746, 749. A pleading will be liberally construed in order to achieve

substantial justice. Johnson v. Herring (1931), 89 Mont. 156, 173, 295 P. 1100, 1105; Rule 8(f), M.R.Civ.P.

Generally, a pleading need only provide "a short and plain statement of the claim that will give the defendant prior notice of what the plaintiff's claim is and the grounds upon which it rests." Conley v. Gibson (1957), 355 U.S. 41, 47, 78 S.Ct. 99, 103, 2 L.Ed.2d 80, 85. Discovery procedures and the pretrial conference under Rule 16 are the primary means of formulating and clarifying the issues so that the only real function of pleadings is that of giving notice. 2A Moore's Federal Practice § 8.13 at 8-71. However, "it is not enough to indicate merely that the plaintiff has a grievance . . . sufficient detail must be given so that the defendant, and the court, can obtain a fair idea of what the plaintiff is complaining and can see that there is some legal basis for recovery." Davis v. Passman (1979), 442 U.S. 226, 238 n.15, 99 S.Ct. 2264, 2273, 60 L.Ed.2d 846, 858, 2A Moore's Federal Practice § 8.13 at 8-13.

The failure to set forth all claims initially is not fatal. Under Rule 15(b), M.R.Civ.P., when issues not raised by the pleadings or amended by the pretrial order are tried by the express or implied consent of the parties, they shall be treated as if raised in the pleading. The general rule is that such amendments shall be freely granted. Union Exchange, Inc. v. Parker (1960), 138 Mont. 348, 357 P.2d 339.

However, liberal construction and amendment of pleadings does not grant counsel carte blanche to advance new theories on an unsuspecting opponent. In Brothers v. Surplus Tractor Parts Corp. (1973), 161 Mont. 412, 506 P.2d 1362, we cautioned counsel in this state that any reliance on the liberality of the courts in granting amendments was at their peril.

> It is generally accepted that the appellant cannot recover beyond the case stated by him in his complaint . . .. This Court believes that fair notice to the other party remains essential, and pleadings will not be deemed amended to conform to the evidence because of "_implied consent_" where the circumstances were such that the other party was not put on notice that a new issues was being raised . . .. (Citations omitted.)

> Rule 15(b), M.R.Civ.P. should be applied liberally to avoid the old requirements of formalism and to allow litigants to proceed efficiently on the merits of the case. However, leave to amend pleading under Rule 15(b), cannot be granted arbitrarily or perfunctorily because the result would create a question of due process in cases where the defendant may not have an adequate opportunity to prepare his case on the new issues raised by the amended pleading, therefore the facts attendant to each case become controlling.

161 Mont. at 417-418, 506 P.2d at 1365.

The McJunkins allege that the District Court improperly granted a directed verdict on the express warranty claim. It is alleged that the District Court based its decision on the McJunkins' failure to plead the claim against Ponderosa. We disagree. A review of the trial transcript indicates that Ponderosa did not request, nor did the court grant, a directed verdict on the express warranty claim. Rather, the court properly found that the claim was not pleaded.

As noted above, the purpose of pleading is to provide notice. See _Conley_, supra. The McJunkins had two and one-half years to amend their complaint. In addition, the pretrial order signed by the parties specifically states that the express warranty claim applied only to K & B. Under these facts, we cannot say the District Court clearly abused its discretion. We hold that the District Court properly refused to submit the issue to the jury.

- 6 -

## Implied Covenant of Good faith and Fair Dealing

The District Court also refused to instruct the jury on the implied covenant of good faith and fair dealing. Although the claim had not been plead, the McJunkins submitted a jury instruction defining good faith "as honesty in fact in the conduct or transaction concerned." We find that the instruction inadequately defines the tort.

The seminal case on the issue of the implied covenant of good faith and fair dealing is Nicholson v. United Pacific Insurance Co. (Mont. 1985), 710 P.2d 1342, 42 St.Rep. 1822. In Nicholson, this Court engaged in an exhaustive examination of the nature of the duty of good faith and fair dealing. We stated:

> The nature and extent of an implied covenant of good faith and fair dealing is measured in a particular contract by the justifiable expectations of the parties. Where one party acts arbitrarily, capriciously or unreasonably, that conduct exceeds the justifiable expectations of the second party. The second party then should be compensated for damages resulting from the other's culpable conduct.

710 P.2d at 1348, 42 St.Rep. at 1829.

The issue before us is not novel. In McGregor v. Mommer (Mont. 1986), 714 P.2d 536, 43 St.Rep. 206 and Dunfee v. Baskin-Robbins, Inc. (Mont. 1986), 720 P.2d 1148, 43 St.Rep. 964, we rejected similar instructions which defined good faith and fair dealing as "honesty in fact." As Nicholson indicates, the covenant of good faith and fair dealing is more than "honesty in fact." Dunfee, 720 P.2d at 1152, 43 St.Rep. at 969. "It requires, at a minimum, that defendants' actions were arbitrary, capricious or unreasonable and exceeded plaintiffs' justifiable expectations." McGregor, 714 P.2d at 543, 43 St.Rep. at 214.

We hold the District Court correctly refused to give the instruction.

## Fraud

The District Court granted a directed verdict in favor of the defendants on the McJunkins claim of constructive fraud. The McJunkins contend that the District Court incorrectly determined that a fiduciary duty is necessary for a constructive fraud claim to lie. We agree with the McJunkins. However, we find the error to be harmless.

Constructive fraud is defined in § 28-2-406, MCA. It provides:

Constructive fraud consists in:

(1) any breach of duty which, without an actually fraudulent intent, gains an advantage to the person in fault or anyone claiming under him by misleading another to his prejudice or to the prejudice of anyone claiming under him; or

(2) any such act or omission as the law especially declares to be fraudulent, without respect to actual fraud.

By its terms, the statute does not require that the plaintiff demonstrate a fiduciary relationship. It merely requires the establishment of a duty. We have recognized that a sufficient duty can arise in a commercial transaction such as the one at hand. Woodahl v. Mathews (1982), 196 Mont. 445, 639 P.2d 1165; Mends v. Dykstra (1981), 195 Mont. 440, 637 P.2d 502; Moschelle v. Hulse (1980), 622 P.2d 155, 37 St.Rep. 1506. We find the defendants had a duty to refrain from intentionally or negligently creating a false impression by words or conduct. Moschelle, 622 P.2d at 159, 37 St.Rep. 1509.

In the instant case, the McJunkins' complaint stated that Ponderosa's representations constituted negligent misrepresentation. The next count contends that the same

representations also constituted constructive fraud. Had the jury been instructed on both theories, the damages would have been the same. Thus, the error is harmless.

As the McJunkins' brief only refers to Ponderosa, we do not address the issue as to K & B. Nor do we reach the issue of actual fraud. The District Court did not address the issue because actual fraud was not pleaded or raised by the McJunkins.

### Implied Warrant of Habitability

The McJunkins allege the District Court improperly granted a directed verdict on the implied warranty of habitability because the defects precluded "realistic" habitation. In Chandler v. Madison (1982), 197 Mont. 234, 642 P.2d 1028, we recognized that the doctrine of caveat emptor no longer reflects the realities of the modern home market. 197 Mont. at 239, 642 P.2d at 1031. We therefore held that the builder-vendor of a new home impliedly warrants that the residence is constructed in such a manner as to be suitable for habitation. Chandler, 197 Mont. at 239, 642 P.2d at 1031. The implied warranty of habitability does not require that the home be defect free, however.

In the instant case, the District Court found that the mobile home was habitable. We agree. The trailer did not constitute a health or safety hazard. Nor was the mobile home so riddled with defects as to reasonably preclude its use as a residence. The critical determination for a breach of habitability is whether the defects relate to the useful occupancy of the house. Although the problems were a constant source of irritation for the McJunkins, the experts for both parties agreed that the trailer was habitable. The warranty of habitability is not so broad as to provide a remedy for minor defects and annoyances. See Klos v. Gockey (Wash. 1976), 554 P.2d 1349.

## Merchantability

The District Court also granted a directed verdict on the McJunkins' claim of breach of the implied warranty of merchantability because "it is excluded by the express language of the sales document." The language in question provides:

> 8. WARRANTIES: THE DEALER SHALL GIVE OVER TO THE BUYER COPIES OF ANY AND ALL WRITTEN WARRANTIES COVERING THE WITHIN DESCRIBED UNIT, OR ANY APPLIANCE OR COMPONENT THEREIN, WHICH HAVE BEEN PROVIDED BY THE MANUFACTURER OF THE UNIT OR APPLIANCE OR COMPONENT, RESPECTIVELY. <u>IT IS UNDERSTOOD AND AGREED THAT EXCEPT AS MAY BE REQUIRED UNDER APPLICABLE STATE LAW THE DEALER MAKES NO WARRANTIES WHATSOEVER REGARDING THE UNIT OR ANY APPLIANCE OR COMPONENT CONTAINED THEREIN. THE DEALER EXPRESSLY DISCLAIMS ANY IMPLIED WARRANTIES, INCLUDING THE IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR USE.</u> (Emphasis in original.)

The McJunkins contend that the "disclaimer" is invalid because there is no evidence they ever saw or were made aware of the disclaimer, nor were they made aware of its significance. Section 30-2-316, MCA, does not require that a disclaimer of implied warranties be specifically pointed out to the consumer. In order to "exclude or modify the implied warranty of merchantability or any part of it the language must mention merchantability and in case of a writing must be conspicuous. . .." Section 30-2-316(2), MCA.

In the instant case, the disclaimer was not hidden in the fine print. The language was in larger, darker, bolder type. It was also capitalized and underlined. The fact that the disclaimer appeared on the back of the purchase agreement is not per se sufficient to render the disclaimer ineffective. It is fundamental that a person is presumed to have read the contractual agreements that they enter into. We find that the disclaimer at issue satisfies the

requirements of § 30-2-316(2), MCA. See Schlenz v. John Deer Co. (D. Mont. 1981), 511 F.Supp. 224, 228.

## Strict Liability

The McJunkins contend that the District Court should have instructed the jury on the theory of strict liability. Defendants contend that the McJunkins failed to plead strict liability as a theory of recovery. The issue requires two considerations, whether the evidence justified such instructions, and whether the failure to plead strict liability constituted such a lack of notice of the issues to the defendants that such instructions would be improper or no amendment to the pleadings could be granted.

In Brandenburger v. Toyota Motor Sales (1973), 162 Mont. 506, 513 P.2d 268, this Court joined a growing number of states which had adopted strict liability as defined by 2 Restatement (Second) of Torts, § 402A. Mr. Justice Harrison, speaking for the Court, indicated that the essential rationale behind the theory of strict liability was to afford the consuming public maximum protection from defective products by requiring the manufacturer who reaps the profit of sales to also bear the burden of injuries and loss. 162 Mont. at 517, 513 P.2d at 275. For, "it is apparent from a reading of the Restatement, and the leading cases on this subject, that the doctrine of strict liability was evolved to place liability on the party primarily responsible for [an] injury occurring, that is, the manufacturer of the defective product." 162 Mont. at 514, 513 P.2d at 273.

In the nearly 15 years since Brandenburger, this Court has repeatedly returned to the source of Montana's theory of strict liability. In Thompson v. Nebraska Mobile Homes (1982), 198 Mont. 461, 647 P.2d 334, we were confronted with whether a claim for strict liability in tort would lie where the only harm was to the consumer's property. Thompson also

- 11 -

involved a "lemon" mobile home. Mrs. Thompson was plagued by cold air blowing through the home's outlets, cupboards and closets. After several phone calls during a two year period, a factory man visited the home and caulked the bedroom closet floor. The caulking was insufficient, however. Mrs. Thompson found it necessary to install a gas heater as well as several electrical heaters in an effort to keep warm.

Sometime after the caulking was performed, Mrs. Thompson noticed that the living room ceiling was sagging approximately four inches and that the walls of the mobile home were bowed. Her pleas for assistance fell on deaf ears.

Consistent with the Brandenburger rationale, an unanimous court found strict liability applicable:

> The rationale [cited] in Brandenburger also applies under these circumstances. The public remains in an unfair bargaining position as compared to the manufacturer. In the case of damage arising only out of loss of the product, this inequality in bargaining position becomes more pronounced. Warranties are easily disclaimed. Negligence is difficult, it not impossible, to prove. The consumer does not generally have large damages to attract the attention of lawyers who must handle these cases on a contingent fee. We feel that the consumer should be protected by affording a legal remedy which causes the manufacturer to bear the cost of its own defective products. By allowing a claim for strict liability in tort we are joining with the jurisdictions of New Jersey, Wisconsin, Michigan, Minnesota and Colorado in affording legal recourse to all victims damaged by defects resulting from the manufacturing process.

198 Mont at 466-67, 647 P.2d at 337.

In the instant case, we are confronted with a situation very similar to Thompson. The District Court found that the McJunkins failed to satisfy the elements of § 402A, however. It provides:

> (1) One who sells any product in a defective condition unreasonably dangerous to the user or

- 12 -

consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

(a) the seller is engaged in the business of selling such a product, and

(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

(2) The rule stated in Subsection (1) applies although

(a) the seller has exercised all possible care in the preparation and sale of his product, and

(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.

The defendants contend that the McJunkins failed to establish that the mobile home was in a "defective condition unreasonably dangerous." (Emphasis added.) Thus, the first question for determination is whether a plaintiff is required to show that the product is defective and also that it was unreasonably dangerous.

The dual test propounded by the commentaries to Section 402A of the Restatement (Second) of Torts has been criticized as "vague and very imprecise." See Keeton, Product Liability and the Meaning of Defect, 5 St. Mary's L. J. 30, 32 (1973).

> It is unfortunate perhaps that Section 402A of the Restatement (Second) of Torts provides that as a basis for recovery it must be found that the product was both "defective" and "unreasonably dangerous" when as a matter of fact the term "unreasonably dangerous" was meant only as a definition of defect. The phrase was not intended as setting forth two requirements but only one . . .

Keeton, 5 St. Mary's L. J. at 32. Professor Keeton's argument has merit. We agree with the drafters of the

Uniform Products Liability Act that a modified approach is needed. The position taken in the commentaries is not consistent with the mandate of Brandenburger and Thompson. We have stated that this Court shall not blindly follow the dictates of the Restatement commentaries.

> We emphasize that this Court adopted the rule as set out in the Restatement, but we did not and do not intend the restraints in the comments to this rule to hamstring us in developing and refining the rule of strict liability. To the extent that the comments are helpful in our development of the law, we shall accept them; but we will reject them where we believe a more appropriate explanation of the rule of strict liability can be provided.

Stenberg v. Beatrice Foods Co. (1978), 176 Mont. 123, 128-129, 576 P.2d 725, 729. We believe the central issue is whether the product is defective. We therefore chart a separate course.

In Rix v. General Motors Corp. (Mont. 1986), 723 P.2d 195, 43 St.Rep. 1296, we distinguished a design defect from a manufacturing defect. Under a manufacturing defect theory, the central question is whether the product is flawed due to improper construction.

> [M]anufacturing defects, by definition, are "imperfections that inevitably occur in a typically small percentage of products of a given design as a result of the fallibility of the manufacturing process. A [defectively manufactured] product does not conform in some significant aspect to the intended design, nor does it conform to the great majority of products manufactured in accordance with that design." . . . Stated differently, a defectively manufactured product is flawed because it is misconstructed without regard to whether the intended design of the manufacturer was safe or not. Such defects result from some mishap in the manufacturing process itself, improper workmanship, or because defective materials were used in construction . . .. (Emphasis added.)

In contrast, a design defect is one which "presents an unreasonable risk of harm, notwithstanding that it was meticulously made according to [the] detailed plans and specifications" of the manufacturer. Thus, unlike manufacturing defects, design defects involve products which are made in precise conformity with the manufacturer's design but nevertheless result in injury to the user because the design itself was improper.

723 P.2d at 200, 43 St.Rep. at 1301-02.

Naturally, a product is defective it if is unreasonably dangerous. Rost v. C. F. & I. Steel Corp. (1980), 189 Mont. 485, 488, 616 P.2d 383, 385. The lack of a dangerous aspect does not automatically preclude a finding that the product is defective, however. As Thompson demonstrates, the Brandenburger rationale is equally appropriate in situations of purely economic loss without a finding of unreasonable danger.

We do not adopt a theory of absolute liability for all defects. As Rix indicates, in order for a product to be "defective" within the meaning of a manufacturing defect theory, the defect must be significant. Strict liability is not intended to replace a breach of contract action for minor defects. However, defining strict liability solely in terms of unreasonably dangerous does not adequately set forth the concept enunciated in Brandenburger. The proper test of a defective product is whether the product was unreasonably unsuitable for its intended or foreseeable purpose. If a product fails this test, it will be deemed defective.

In the instant case, the McJunkins failed to demonstrate the product was defective or unreasonably dangerous. The testimony of the experts indicated that the trailer was in fact habitable. Consequently, we find that the trailer was fit, suitable, and safe for its intended purpose i.e. a

residence. We need not decide defendants' contention that the McJunkins failed to plead strict liability.

### Punitive Damages

The McJunkins contend that the District Court erroneously determined that "there's insufficient proof to justify the giving of such an instruction." We hold the District Court was correct.

At the time of trial, § 27-1-221, MCA (1985), delineated when punitive damages were proper. It provides, in pertinent part:

> When exemplary damages allowed. (1) Subject to subsection (2), in any action for a breach of an obligation not arising from contract where the defendant has been guilty of oppression, fraud, or malice, actual or presumed, the jury, in addition to the actual damages, may give damages for the sake of example and by way of punishing the defendant.
>
> (2) The jury may not award exemplary or punitive damages unless the plaintiff has proved all elements of the claim for exemplary or punitive damages by clear and convincing evidence. Clear and convincing evidence means evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence. It is more than a preponderance of evidence, but less than beyond a reasonable doubt.
>
> (3) Presumed malice exists when a person has knowledge of facts, intentionally avoids learning of facts, or recklessly disregards facts, knowledge of which may be proven by direct or circumstantial evidence, which creates a high degree of risk of harm to the substantial interests of another, and either deliberately proceeds to act in conscious disregard of or indifference to that risk or recklessly proceeds in unreasonable disregard of or indifference to that risk.
>
> (4) The plaintiff may not present, with respect to the issue of exemplary or punitive damages, any evidence to the jury regarding the defendant's financial affairs or net worth unless the judge

- 16 -

first rules, outside the presence of the jury, that the plaintiff has presented a prima facie claim for exemplary or punitive damages.

(5) A defendant is guilty of oppression if he intentionally causes cruel and unjust hardship by:

(a) misuse or abuse of authority or power; or

(b) taking advantage of some weakness, disability, or misfortune of another person.

We find that the McJunkins failed to demonstrate oppression, fraud, or malice, actual or presumed by clear and convincing evidence. At most, the McJunkins showed that the defendant's repeated attempts to repair the defects were ineffective. We hold the District Court correctly refused to instruct on punitive damages.

### Jury View

Prior to the time of trial, Ponderosa added furniture, drapes, and minor decorations to the mobile home in question. It is alleged that permitting the jury to view the property in this altered state prejudiced the McJunkins' case. We disagree.

The decision to permit or deny a jury view of the property in question is left to the sound discretion of the trial court. Section 25-7-401, MCA, provides, in pertinent part:

> When in the opinion of the Court, it is proper for the jury to have a view of the property which is the subject of the litigation . . ., it may order the jurors to be conducted in a body, under charge of an officer and one person representing each party . . ..

The addition of furniture or minor cosmetic changes is not dispositive. It is generally held that even where there has been changes in the condition of the object of litgation, a jury view is still within the discretion of the court.

Clark v. Worrall (1965), 146 Mont. 374, 379, 406 P.2d 822, 824. It is not an abuse of discretion to allow the jury to view the premises where the changes are not material. Clark, 146 Mont. at 379, 406 P.2d at 825. In the instant case, the changes were not material. We find the District Court did not abuse its discretion.

### Negligence and Negligent Misrepresentation

Ponderosa contends that the District Court incorrectly refused to grant a directed verdict on the negligent misrepresentation claim. When deciding whether a motion for directed verdict is proper, a case should not be withdrawn from the jury if reasonable men may differ as to the conclusions drawn from the evidence. Solich v. Hale (1967), 150 Mont. 358, 435 P.2d 883. The evidence showed that Gusick told the McJunkins not to worry, that all the problems would be taken care of. The numerous problems were not in fact remedied. When the McJunkins complained about the problems and ineffective repairs, Ponderosa often answered it was K & B's problem. We hold the issue was properly submitted to the jury.

Similarly, K & B contends that there was insufficient evidence to submit the negligence claim to the jury. We find K & B's claim frivolous. It is not necessary to repeat the laundry list of defects which riddled the mobile home.

The judgment of the District Court is affirmed.

_____
John C. Sheehy
Justice

We Concur:

_____
Chief Justice

- 18 -

John Conway Harrison

_(signature)_

L. C. Gulbrandson

William E. Hunt

R. C. McDonough
Justices